[No. 24124. Department One. February 2, 1933.]

CREDITORS CLAIM & ADJUSTMENT COMPANY, *Respondent*, v. FIRST SEATTLE DEXTER HORTON NATIONAL BANK, *Appellant*.[1]

[1]Reported in 18 P. (2d) 844.

*Graves, Kizer & Graves,* for appellant.

*E. H. Belden,* for respondent.

PARKER, J.—This is a garnishment controversy. Its correct disposition depends upon whether or not the following draft became, by its original issuance, a duly accepted negotiable draft or bill within the general rule that a draft or bill drawn upon the drawer, himself or itself, thereby becomes, in legal effect, an accepted draft or bill so that the indebtedness evidenced thereby becomes owing to its subsequent holder, for value, in good faith, and not an indebtedness owing to the original payee, and, as such, subject to garnishment at the suit of his creditor.

"583.23 December 26, 1930
FIDELITY-PHENIX FIRE INSURANCE COMPANY
OF NEW YORK
Pacific Coast Department
60 Sansome Street, San Francisco, Cal.
"Upon acceptance pay to the order of A. O. LARSON DBA HOME TOGGERY COMPANY; SPOKANE MERCHANTS ASSOCIATION exactly $583 & 23 cts. Dollars for loss which occurred Nov. 6, 1930, on property described in Policy No. 10257 issued at Coeur d'Alene, Idaho, and said policy is hereby reduced.
"Harry Howes,
General Adjuster."

The words "Home Toggery Company" appearing in the draft are but a designation of the name under which the defendant Larson was doing business. The

other drawee named in the draft, "Spokane Merchants Association," has at all times since the loss disclaimed any interest in the draft; this, manifestly, because its insurable interest in the property ceased before the loss occurred. So we are called upon to consider the draft as if Larson were the only payee therein designated. The words, "said policy is hereby reduced," manifestly were used because the loss was only partial.

Sometime prior to November 7, 1930, the garnishee defendant Fidelity-Phenix Fire Insurance Company issued its policy of insurance covering furniture and fixtures, payable to Larson and the Spokane Merchants Association, as their interest may appear. After the issuance of the policy, that association transferred to Larson all its interest in the property, and thereafter on November 7, 1930, a portion of the insured property was destroyed by fire. On December 26, 1930, that loss was adjusted in due course, and settlement made therefor by the issuance and delivery to Larson of the draft above quoted, the general adjuster evidently overlooking the merchants association having ceased to have any interest in the policy. Soon thereafter, Larson sold and transferred the draft for cash to the intervener, First Seattle Dexter Horton National Bank, which bank has at all times since then been the owner and holder thereof.

Soon thereafter, the plaintiff adjustment company commenced an action in the superior court for Spokane county, seeking recovery against the defendant, Larson, upon a merchandise account, and caused a writ of garnishment to be issued therein and served upon the insurance company, requiring it to answer as garnishee defendant touching its indebtedness, if any, to Larson. The insurance company answered the garnishment writ, setting up the issuance of its policy to

Larson, the loss and adjustment thereof, and the issuing of the above quoted draft in settlement of the loss, and that it "does not know the whereabouts of said draft." Thereafter, the draft was, by the bank, through its San Francisco correspondent, presented for payment to the insurance company at its Pacific Coast department office in that city, when payment thereof was refused by the insurance company because of the pending garnishment proceeding against it; conceding, however, that it was indebted as evidenced by the draft and assuming the attitude of a mere stakeholder as between the adjustment company and the bank.

Thereupon, the bank filed in the garnishment proceeding by leave of court, its complaint in intervention, claiming to be the owner of the draft as a negotiable instrument, and praying that it be so adjudged as against the adjustment company and the insurance company, and that the draft be accordingly so honored. The adjustment company, by answer, responded to the complaint in intervention, claiming the indebtedness evidenced by the draft to be subject to its garnishment writ served upon the insurance company, as an indebtedness owing to Larson, unimpaired by the draft as a negotiable instrument in the hands of the bank. The insurance company, by answer, responded to the complaint in intervention and to the answer of the adjustment company, assuming the attitude of a mere stakeholder, and praying that it be protected as such.

There was filed in the cause a stipulation as to certain facts, which the trial court considered as evidence upon the trial, reading in part as follows:

"That one Harry Howes is a general fire insurance adjuster residing in the City of San Francisco and is the adjuster for a number of different insurance companies having their headquarters in San Francisco,

and among other companies, the garnishee defendant by whom he is paid a monthly salary, and he has charge of adjusting all of garnishee defendant's losses on the Pacific Coast; that upon the garnishee defendant being notified of the loss under its policy by the insured named in said policy, it instructed the said Harry Howes to adjust said loss and he thereupon employed an adjuster in Spokane to adjust same, and the adjuster in Spokane did adjust said loss, fixing the amount thereof at the sum of $583.23, and the Spokane adjuster then reported said adjustment and proof of said loss to the said Harry Howes, and upon receipt of same, said Harry Howes approved such adjustment and drew draft as set out in intervenor's complaint in intervention, which draft was in the sum found by the Spokane adjuster to be the amount of the loss of the said A. O. Larson; that said draft was forwarded by said Harry Howes to the defendant A. O. Larson and was received by said Larson, and said Larson thereafter requested the First Seattle Dexter Horton National Bank to cash said draft, which it did in the usual and ordinary course of business for a valuable consideration, . . . ''

It was the custom of the insurance company in its Pacific Coast business to have its losses first adjusted locally by special adjusters or agents, subject to approval by Howes, its general adjuster, such local adjusters being authorized to issue drafts in this form, which were paid at the San Francisco office upon approval of Howes, the general adjuster. But in this case the proof of loss came to Howes, and he, himself, issued this draft in settlement thereof.

The foregoing summary of the facts, we think, is well supported by the record before us.

The garnishment proceeding, to which the garnishee plaintiff, adjustment company, the garnishee defendant, insurance company, and the intervener bank were parties, the original defendant Larson not appearing

therein, was tried in the superior court, sitting without a jury, resulting in findings and judgment in harmony with the above summary of the facts. The judgment denied the intervener bank relief as prayed for by it, deciding, in substance, that the draft is not a duly accepted draft, and therefore not a negotiable instrument freeing the debt evidenced thereby from garnishment as a debt owing by the insurance company to Larson. From this judgment, the bank has appealed to this court.

 In our negotiable instrument statute, we read:

"Where in a bill drawer and drawee are the same person, or where the drawee is a fictitious person, or a person not having capacity to contract, the holder may treat the instrument, at his option, either as a bill of exchange or a promissory note." Rem. Rev. Stat., § 3520.

In *Clemens v. Stanton Co.*, 61 Wash. 419, 112 Pac. 494, this court approved the general rule stated in the text of 7 Cyc. 599, that "a bill may be drawn upon the drawer himself, and is then in effect the promissory note or the accepted bill of the drawer, at the holder's election." See, also, 8 C. J. 297, and authorities there cited. We do not understand counsel for the adjustment company to challenge this as a correct statement of a general rule of law.

 Our present problem is then reduced to this: Did the drawing of the draft here in question, signed by Harry Howes as general adjuster, constitute, in legal effect, a draft drawn by the insurance company upon itself? This depends upon the nature and extent of his agency authority to finally bind the insurance company in the adjustment and settlement of the loss, by the issuance of such draft.

In *Clemens v. Stanton Co.*, 61 Wash. 419, 112 Pac.

494, there was drawn in question the acceptance by Stanton company, the drawee, of the following draft:

"$1688.10 (Buyers' Draft.) No. 129.
"Spokane, Wash., Sept. 13, 1909.
"E. H. Stanton Company, at three days sight, pay to the order of H. N. Clemens Sixteen hundred eighty-eight 10-100 Dollars, for hogs.
Payable at the Spokane & Eastern Trust Co., Spokane, Wash.
To E. H. Stanton Company, 212 Bernard St., Spokane, Wash.
 "(Signed) E. F. Humason."

Humason, who signed the draft, was the agent of Stanton company for the purpose of purchasing hogs for it and drawing drafts upon it in payment thereof. It was held that the draft so drawn was, in legal effect, a draft drawn by the Stanton company upon itself, and that the draft thereby became a duly accepted draft, and needed no further evidence of its acceptance to enable Clemens to successfully maintain his action seeking recovery thereon against Stanton company.

In *First National Bank v. Rhode Island Ins. Co.*, 184 Ark. 812, 43 S. W. (2d) 535, there was drawn in question a draft drawn upon the insurance company in payment of a loss under one of its policies substantially of the same import as the draft here in question, signed only "E. G. Peiper, President"; that is, it was not signed with the name of the insurance company by Peiper as president. That was a garnishment controversy substantially of the same character as this controversy. Holding that draft to be a duly accepted draft by virtue of its issuance in this manner by the president, Chief Justice Hart, speaking for the court, said:

"Under our Negotiable Instruments Act, § 7896 of Crawford & Moses' Digest, where, in a bill of ex-

change, the drawer and the drawee are the same person, the holder may treat the instrument at his election either as a bill of exchange or as a promissory note. This was the law prior to the passage of the act in question. A bill of exchange drawn by the maker upon himself is in legal effect a promissory note and cannot be countermanded. Where a bill of exchange is drawn by a corporation upon itself, the instrument may be treated as an accepted bill or as a promissory note, at the election of the holder. 8 C. J. par. 23, pp. 42-43; 3 R. C. L. par. 62, p. 878; 1 Daniel on Negotiable Instruments (6th Ed.) §§ 128 and 426; *Hasey v. White Pigeon Beet Sugar Co.,* 1 Doug. (Mich.) 193; *Cunningham v. Wardwell,* 12 Me. (3 Fair.) 466; *Marion & Mississinewa R. Co. v. Hodge,* 9 Ind. 163; *Drinkall v. Movius State Bank,* 11 N. D. 10, 88 N. W. 724; *Pavenstert v. New York Life Ins. Co.,* 203 N. Y. 91, 96 N. E. 104, Ann. Cas. 1913A, p. 805; and *Bailey v. Triplett Bros.,* (Tex. Civ. App.) 286 S. W. 914.

"In the present case, the instrument which is the basis of the suit was in form a bill of exchange. It was drawn by the corporation, Rhode Island Insurance Company, under the signature of its president upon itself. In other words, it was a bill of exchange drawn by the corporation through its proper officer upon itself, and was not therefore subject to countermand.

"It is claimed, however, that it was conditional because of the words 'upon acceptance' in it. Under our statute, and under the principles of law above announced, these words had no legal effect on the instrument. They were in the instrument when it was signed by the president of the corporation, and the very act of drawing the bill is deemed an acceptance of it, and the holder may treat it as an accepted bill of exchange or as a promissory note."

We do not lose sight of the apparently wide scope of the general agency of Peiper, suggested by the word "president" following his signed name to the draft, and that the agency of the general adjuster Howes who signed the draft here in question is apparently of

a more limited character. But the proof in this case shows that Howes was, at the time of issuing this draft, the general adjuster of the insurance company as a salaried agent, and that he had "charge of adjusting all of garnishee defendant's losses on the Pacific Coast," warranting the conclusion that he had the authority to finally bind the insurance company for the payment of losses under its policies, and issue or approve the issuing of drafts upon the insurance company in final settlement thereof. This, we think, evidences as wide and complete an agency power in adjusting and finally fixing loss obligations upon the insurance company as is suggested by the signature "E. G. Peiper, president," in the issuance of the draft involved in the *Rhode Island Insurance Company* case.

The decision of the supreme court of New Mexico in *First National Bank v. Home Insurance Co.*, 16 N. M. 66, 113 Pac. 815, lends support to this view. See, also, 8 C. J. 297, and authorities there cited.

Counsel for the adjustment company call to our attention, and place reliance upon, the decision of the Massachusetts court in *Berenson v. London & Lancashire Fire Ins. Co.*, 201 Mass. 172, 87 N. E. 687. The draft there in question was signed "Joseph F. Givernaud, Special Agent." Viewing this signature and agency designation, together with the introductory words of the draft "upon acceptance," the court held that the draft was not one drawn by the insurance company upon itself.

We do not find in the opinion any indication that there was any proof of the scope of the special agent's authority. We also note that, upon the face of that draft, there was a blank line followed by the word "manager," evidently intended as a place for the signature of such an agent. No such signature was upon

the draft. We also note that, upon the face of that draft, there was a blank line preceded by the word "countersigned" and followed by the word "cashier," evidently intended as a place for the signature of such an officer. No such signature was upon the draft. We think that decision is not controlling in our present inquiry.

We have not overlooked the fact that this draft is not signed with the name of the insurance company by its general adjuster. This might seem to furnish some room for arguing that the draft was not issued by the insurance company upon itself. Such an argument, it seems to us, is effectually answered by the fact that Howes was authorized to so obligate the insurance company. The authorities above noticed manifestly recognized this theory as sound.

We are of the opinion that the intervener bank is entitled to the relief for which it prays; that is, that it is entitled to the proceeds of the draft and a judgment accordingly against the garnishee plaintiff, adjustment company, and the garnishee defendant, insurance company. It also follows that the insurance company is entitled to an adjudication that it is not liable under the writ of garnishment for the indebtedness evidenced by the draft.

Counsel for the adjustment company have moved to dismiss the appeal of the bank because notice thereof was not served upon Larson, the original defendant. We think the answer to this contention is found in the fact that Larson never appeared in the garnishment proceedings. Indeed, he did not appear in the original action, though personally served therein, and was accordingly adjudged to be in default. *McDougall v. Bridges,* 52 Wash. 396, 100 Pac. 835; *Champagne v. Birnot,* 143 Wash. 187, 254 Pac. 829; *Lowe v. Clark & Co.,* 150 Wash. 267, 272 Pac. 955.

The judgment is reversed, and the cause remanded to the superior court with directions to render its judgment awarding to the bank relief as herein indicated.

TOLMAN, HOLCOMB, MITCHELL, and MILLARD, JJ., concur.